Filed 1/27/21  P. v. Bruno CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C086297 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE019105) |
| v. | |
| RODNEY LEWIS BRUNO, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury found defendant Rodney Lewis Bruno guilty of the first degree murder of Virgil T.  (Pen. Code, § 187, subd. (a); statutory section references that follow are to the Penal Code unless otherwise stated.)  The jury also found true an allegation that defendant used a dangerous and deadly weapon to commit the murder.  At a bifurcated

1

hearing, the court found true allegations that defendant had committed two prior serious felonies. The trial court sentenced defendant to 86 years to life in prison.

On appeal, defendant raises six arguments. First, defendant argues his conviction must be reduced from first to second degree murder, because there was no substantial evidence to support a finding that defendant committed the murder deliberately and with premeditation. Second, defendant argues the jury instructions improperly permitted the jury to find him guilty of first degree murder, even if an unreasonable heat of passion negated the elements of deliberation and premeditation. Third, defendant argues the trial court erred and violated his constitutional rights when it excluded expert testimony that would have indicated a high level of methamphetamine found in Virgil's[1] blood might have caused Virgil to act aggressively. Fourth, defendant argues he was deprived of his constitutional right to effective assistance of counsel because his trial counsel did not object to analogies used by the People in explaining premeditation and deliberation during closing arguments. Fifth, defendant argues the cumulative prejudice of the four prior alleged errors rendered his trial unfair. Sixth, in a supplemental opening brief, defendant argues we must remand the case to the trial court for resentencing due to an amendment in the sentencing law that would have permitted the trial court to strike sentencing enhancements it imposed based on defendant's prior convictions.

We affirm the judgment.

FACTS AND PROCEDURAL HISTORY

Facts

Matthew Bruno is defendant's cousin. In October 2016, Matthew lived in a house with his brother, William, and long-time girlfriend, Nina. Nina's stepbrother, Virgil, was

---

[1] Throughout this opinion, we use the first names for the victim and witnesses to the murder, because many of them share a last name with at least one other witness.

2

staying in the backyard in a tent. Virgil's sister, Lucinda, and his nephew, Tavares, would often stay at the house. Alyce, defendant's girlfriend, would sometimes sleep on the couch or in her car in the driveway. Shayla O'Connell's grandmother, Beverly O'Connell, lived in a home with a property line that abutted Matthew's.

A couple of days before October 2, 2016, Virgil and Alyce had an argument. Virgil went into a room and put his cellphone on a dresser. Alyce came in the room and, thinking the phone was hers, tried to grab the phone at the same time as Virgil, resulting in a tussle where Virgil grabbed the phone from Alyce's hand. Alyce told Virgil she was going to tell defendant that Virgil had put his hands on her.

The night after the cellphone incident, there was another incident involving Virgil and Alyce. Alyce had a cat. Matthew had been taking care of the cat at his house. He found the cat crying under a couch. When Matthew removed the cat from under the couch, he could tell that the cat had been kicked or stomped in its mid-section and had suffered an injury like a broken back. Matthew did not see anyone injure the cat, but he believed that Virgil harmed the cat, and he told Alyce. The cat died a day or two later as a result of the injury.

On the afternoon of October 2, 2016, Matthew was in the kitchen making brunch, and Lucinda was in the living room. Virgil and Tavares were in the backyard. Alyce and defendant came in the house. Alyce went to check on her cat, and defendant went into the backyard. Matthew looked out the backdoor and could see defendant and Virgil talking, standing three to four feet apart. Matthew heard defendant ask Virgil why he killed his cat. Shayla heard arguing, and peeked over the wall that divided her grandmother's property from Matthew's yard, and saw a man she believed was Matthew yelling at another man about needing to respect women and not put your hands on them. The other man apologized. Shayla observed the man she believed to be Matthew was wearing a white shirt. Virgil and defendant walked through the house to move from the backyard to the driveway and finished talking. After they finished talking, Matthew

3

heard what sounded like Virgil or defendant pushing the other against a fence, then both men came back in the house, with Virgil proceeding to the backyard and defendant visiting with people indoors.

Matthew resumed cooking. Then, he heard a commotion and what sounded like a fearful scream from out back. Matthew heard what sounded like people fighting coming through the backdoor. Shayla, who had moved to a balcony overlooking Matthew's backyard, believes it was about 10 to 15 minutes between when she first looked into Matthew's yard and when she saw the man she believed was Matthew and someone else going into the house during an argument, an estimate that is consistent with how long Beverly believes she heard shouting coming from Matthew's and Nina's yard that afternoon. Matthew turned to see Virgil and defendant fighting. Defendant followed Virgil as they entered the house. They were both swinging. Matthew yelled, but the two men did not stop fighting. Tavares came in through the backdoor and Matthew could hear Alyce screaming to stop. Virgil slipped and fell onto his back in the kitchen. Defendant kept punching, and Virgil would swing and kick back. Defendant was making a fist, and Matthew didn't see anything in defendant's hands. However, Lucinda saw a shiny object like a sharp blade in defendant's fingers as he was punching Virgil. Matthew saw thick blood come out of a "gaping chest wound" in Virgil's chest. Matthew yelled for defendant to stop and believes he picked up a bicycle rim, and Lucinda yelled, "why are you killing my brother?" Defendant stopped and said something like "all right, all right, all right. I just wanted to tell him something," and held up empty hands. Defendant calmly said, "it's nothing," a phrase Virgil often used when dealing with an argument or confrontation. Matthew estimated six to seven seconds passed between when Virgil and defendant entered the house and defendant stopped punching Virgil. Matthew heard defendant ask Virgil if it was worth it.

Alyce grabbed her cat, and she and defendant got in her car and left. Alyce seemed frantic, but defendant seemed calm. Tavares tried to help Virgil. Matthew found

4

a phone and told Lucinda to dial 9-1-1. Someone pulled Virgil into the front yard. Matthew told Lucinda and Tavares he would be at the UC Davis Medical Center visiting Nina, who was in the hospital treating an infection, and he rode his bicycle to the hospital. At the hospital, Matthew told Nina what happened. The fire department pronounced Virgil dead at the scene.

Matthew met detectives outside the hospital, and he accompanied them to the Hall of Justice for an interview. Before transporting Matthew to the interview, the detectives searched him, and he gave them a knife he had in his possession. The blade on the knife is about two inches long, and Matthew claims he uses it to do things like clean his fingernails. Matthew told the detectives defendant has a similar knife.

After they left the house, defendant and Alyce drove to another of defendant's cousin's residence, pulled the car behind a fence that hid the car, and locked the gate. Detectives found Alyce and defendant at the residence the next day. When a police officer searched the car, she found (1) a pocketknife with a one-and-three-quarter inch blade in the center console; (2) a case containing screwdrivers that were each roughly two inches in length in the center console; and (3) a wood handle with a four-and-one-eighth inch metal object attached in the front side driver's door panel.

An examination of Virgil's body found multiple stab wounds. The wounds included a 13-centimeter-deep stab wound to Virgil's left chest that could cause and appears to have caused profuse bleeding, a stab wound to the right upper abdomen, an 11.5 centimeter deep stab wound to the left forearm that severed Virgil's brachial artery that could have caused rapid blood loss, and superficial wounds on Virgil's arms and legs. A forensic pathologist determined Virgil's cause of death was multiple sharp force injuries that caused blood loss. An examination of the scene found some drops of blood outside, and copious amounts in and near the kitchen.

The police officer who collected DNA samples and clothing from defendant the day after the murder collected a white t-shirt and black sweatshirt. The police officer

5

who collected Matthew's clothing the day of the murder testified Matthew was wearing a black tank top and a red, white, and gray striped polo shirt. At trial, Shayla did not recognize Matthew in a photograph taken the day of the murder. Also at trial, Lucinda testified that at some point before the fight in the kitchen, she heard defendant yelling at Virgil about disrespecting his girlfriend, and she did not hear other voices shouting.

Procedural History

The People filed an amended information charging the defendant with the murder of Virgil, pursuant to section 187, subdivision (a). The information further alleged, as an enhancement, that defendant used a deadly and dangerous weapon when he murdered Virgil, as contemplated by section 12022, subdivision (b)(1). The information also alleged defendant had previously been convicted of two felony crimes, and was therefore eligible to be sentenced under the three strikes law within the meaning of section 667, subdivision (e)(2), and section 1170.12, subdivision (c)(2). The jury was instructed that it could find the defendant guilty of first or second degree murder, or the lesser included offense of voluntary manslaughter. The jury found defendant guilty of first degree murder and found true the enhancement that defendant used a deadly and dangerous weapon when he committed the offense.

Prior to pronouncing its sentence, the trial court found true allegations that defendant had two prior felony convictions within the meaning of the three strikes law. The trial court denied defendant's request to strike a prior conviction.

On January 5, 2018, the trial court sentenced defendant to 25 years to life, and tripled the sentence due to the prior two strikes, resulting in a base sentence of 75 years to life as an indeterminate term. The court also imposed an additional one-year sentence for the section 12022 enhancement and an additional 10-year sentence for the two priors, for a total determinate sentence of 11 years. Defendant filed his notice of appeal the same day the trial court sentenced him.

6

Additional procedural details will be provided below in discussing the relevant issues.

I

*Distinctions Between First and Second Degree Murder and Voluntary Manslaughter*

Four of defendant's arguments rely on distinctions between voluntary manslaughter, second degree murder, and first degree murder. As such, we begin our discussion with an overview of the elements of those crimes and where they differ.

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) Manslaughter is defined as voluntary when a defendant kills without malice "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).)

In contrast, "[m]urder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice aforethought can be established, "if it is shown that the killing resulted from an intentional act with express or implied malice." (§ 188, subd. (b).) "All murder that is perpetrated by . . . any . . . kind of willful, deliberate, and premeditated killing . . . is murder of the first degree." (§ 189, subd. (a).) "All other kinds of murders are of the second degree." (§ 189, subd. (b).)

A finding that a defendant was acting upon a sudden quarrel or heat of passion can reduce murder to voluntary manslaughter, or first degree murder to second degree murder. (See *People v. Padilla* (2002) 103 Cal.App.4th 675, 678.) However, in the first instance the test of whether the provocation negated the defendant's ability to form the requisite mental state is objective and in the second it is subjective. (*Ibid.*)

7

## II

*Substantial Evidence Supports a Finding of Premeditation and Deliberation*

Defendant argues his first degree murder conviction must be reduced to a second degree murder conviction because the evidence presented was not sufficient to support a finding that he premeditated or deliberated when he killed Virgil. We disagree.

This court's role in reviewing a challenge to the sufficiency of evidence is limited. (*People v. Smith* (2005) 37 Cal.4th 733, 738.) "To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) In assessing the evidence, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) This is so, because "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*Ibid.*) As such, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*).) And, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [956 P.2d 374].)" (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

8

" 'In the context of first degree murder, premeditation means " 'considered beforehand' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [928 P.2d 485]) and deliberation means a " 'careful weighing of considerations in forming a course of action . . .' " (*People v. Solomon*[ (2010)] 49 Cal.4th 792, 812). "The process of premeditation and deliberation does not require any extended period of time." (*Mayfield*, at p. 767 [the true test of premeditation is the extent of the reflection, not the length of time].) " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*Ibid.*; see *id.* at pp. 767–768 [where defendant wrested the gun from and fatally shot an officer during a brief altercation, the jury could reasonably conclude that "before shooting [the officer] defendant had made a cold and calculated decision to take [the officer's] life after weighing considerations for and against"]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001–1002 [] [aiming weapon at victims whom shooter believed to be rival gang members constituted sufficient evidence of premeditation and deliberation].)' (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10 [].)" (*People v. Salazar* (2016) 63 Cal.4th 214, 245.)

In his argument that there was insufficient evidence to establish premeditation and deliberation in the murder of Virgil, defendant points to evidence categories our Supreme Court identified in *People v. Anderson* (1968) 70 Cal.2d 15. Specifically, in the portion of *Anderson* cited by defendant, the Court observed "[t]he type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing -- what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim . . . ; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according

9

to a 'preconceived design' to take his victim's life in a particular way . . . . ¶ Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson, supra,* 70 Cal.2d at pp. 26-27.)

Defendant argues that while there was evidence of motive in this case, "there was no evidence of planning activity and the manner of killing, multiple stab wounds, was not particular or exacting," and, "[t]he evidence therefore was insufficient to support the premeditation finding."

Additionally, categorizing the killing here as "quick" and reflective of "an explosion of violence," and noting that in *Anderson* the Court found that the infliction of 60 wounds was insufficient to support a finding of premeditation and deliberation (see *Anderson*, *supra*, 70 Cal.2d at pp. 21, 24), defendant contrasts the facts here with cases in which courts found there was sufficient evidence to make a finding of first degree murder and implies that, because the facts here are not similar to the facts in those cases, the evidence must be deemed insufficient here.

For example, defendant tries to support his argument that carrying a pocket knife does not support an inference that defendant had considered that his encounter with Virgil might be violent by citing *People v. Lee* (2011) 51 Cal.4th 620, 636, in which the court indicated evidence that the defendant had carried a loaded handgun supported an inference that the guilty party "had considered the possibility of a violent encounter." Similarly, defendant cites *People v. Jablonski* (2006) 37 Cal.4th 774, 822, in which evidence of surreptitious entry into a residence and of physically restraining victims was used to support a finding of first degree murder, and notes there was no evidence that defendant surreptitiously approached Virgil or restrained him.

Defendant's arguments are misplaced. "The *Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of

first degree murder or alter the substantive law of murder in any way . . . . The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation] ¶ In identifying categories of evidence bearing on premeditation and deliberation, *Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. [Citation] . . . . It is thus evident from the court's own words that it was attempting to do no more than catalog common factors that had occurred in prior cases. The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) Additionally, and logically speaking, that the facts in this case are not on all fours with facts in other cases where first degree murder was found does not mean the killing here cannot also be classified as first degree murder.

Here, when defendant arrived at Matthew and Nina's on the day of the murder, he went to Virgil and confronted him about his interactions with Alyce and the fatal injury to her cat, suggesting that a primary reason for his visit that afternoon was to confront Virgil. After defendant first spoke with Virgil, and Virgil apologized, approximately 10 minutes elapsed before the confrontation that resulted in the fatal stabbing. This suggests that defendant had the opportunity to cool off after receiving an apology from Virgil. Only a small amount of blood was spilled in the backyard, then defendant followed Virgil into the house. Defendant continued to stab Virgil after Virgil had fallen onto his back. Even though Matthew had yelled out, and Virgil was bleeding heavily, had a large chest wound, and was throwing punches and kicking up his legs, defendant continued to stab him. One of Virgil's stab wounds was a 13-centimeter-deep wound in his left chest; so, in the area of his heart. Defendant only stopped swinging his fist at Virgil when Matthew picked up a bicycle rim.

11

These actions that led up to and included defendant inflicting the fatal wounds on Virgil suggest that, even if defendant had not specifically planned to kill Virgil when he arrived at the house, he had time between his arrival and when he inflicted the fatal wounds to consider and decide he was going to inflict mortal injuries on Virgil. Rather than indicating that defendant killed in a heat of passion, in these circumstances, the jury could have reasonably concluded that defendant inflicted multiple stab wounds because he was determined to kill Virgil, and he was going to continue to stab Virgil until he inflicted fatal wounds. (See *People v. Williams* (2018) 23 Cal.App.5th 396, 410 ["The jury could have reasonably found that the victim's injuries reflected an emotional, berserk attack, as suggested by defendant's briefing. But it was permitted to find otherwise"]; *People v. Hillery* (1965) 62 Cal.2d 692, 704 ["defendant plunged the shears deep into [victim's] chest; that defendant must have known that a wound of such severity would be likely to cause (as the pathologist testified that it did cause) massive hemorrhaging resulting in death"].)

Furthermore, when defendant finally stopped striking at Virgil, defendant mocked Virgil by using words Virgil often used to minimize the seriousness of someone else's position in a confrontation--"it's nothing"--and asked if it--presumably his treatment of Alyce and her cat--had been "worth it." This suggests defendant was aware of the nature of the injuries he was inflicting and had decided Virgil deserved those injuries. Finally, once the fatal wounds were inflicted defendant then calmly left the residence and hid with his girlfriend at a cousin's place. A rational jury could have found that, taken together, these facts demonstrate beyond a reasonable doubt that before and while he dealt Virgil a fatal injury, defendant was not acting in a heat of passion, but with a cool-headed awareness of the consequences of his actions.

12

## III

### *The Jury Instructions Were Correct*

Defendant argues that, as given, the jury instructions did not inform the jury that a finding defendant acted with subjective, "unreasonable," heat of passion when he killed Virgil could have reduced the first degree murder finding to a second degree murder finding. He maintains that, taken together, all the jury instructions gave the erroneous impression that the jury could only find defendant acted under "provocation" if that provocation met an objective "reasonable person" test. He argues this purported error was prejudicial because it prevented the jury from considering "substantial evidence" that defendant's "reasoning ability was clouded by anger when he stabbed Virgil," when it determined which degree of murder he committed, and, as such, this court must reduce the first degree murder conviction to a second degree murder conviction. We disagree.

The court provided CALCRIM jury instructions numbered 520, 521, 522, and 570 on the respective issues of finding a defendant committed murder as contemplated by section 187, finding a murder was first degree murder, the impact of provocation, and how a finding that a defendant acted in a "heat of passion" might reduce a finding of murder to a finding of voluntary manslaughter.

CALCRIM No. 520 instructed the jury that, in order to find defendant guilty of murder, the People would have to prove, "1. [t]he defendant committed an act that caused the death of another person; ¶ AND ¶ 2. [w]hen the defendant acted, he had a state of mind called malice aforethought."

CALCRIM No. 521 differentiated between first and second degree murder. Significantly, the jury was instructed that in order to find defendant committed first degree murder, the jury would need to find that the defendant acted willfully, deliberately, *and* with premeditation. The jury was instructed that "willfully" meant that the defendant intended to kill. The term "deliberately" was defined to require that the

defendant "*carefully weighed* the considerations for and against his choice and, *knowing the consequences, decided to kill.*" (Italics added.) Premeditation was defined to require that the defendant "decided to kill before completing the act that caused death." The instruction added, "[t]he length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. *A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.* On the other hand, a cold, *calculated* decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (Italics added.)

CALCRIM No. 522 instructed the jury that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. *The weight and significance of the provocation, if any, are for you to decide.* ¶ If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (Italics added.)

CALCRIM No. 570 provided further instruction as to how a "sudden quarrel" or a "heat of passion" provocation might reduce a "killing that would otherwise be a murder . . . to voluntary manslaughter." It indicated "[t]he defendant killed someone because of a sudden quarrel or in the heat of passion if: ¶ 1. The defendant was provoked; ¶ 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; ¶ AND ¶ 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." CALCRIM No. 570 continued, "[i]n order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation . . . . While no

14

specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time has passed between the provocation and the killing for an ordinary person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis."

The jury instructions did not provide further elaboration indicating a subjective standard may be used in determining if provocation ought to reduce a finding of first degree murder to a finding of second degree murder. Defendant did not object to CALCRIM Nos. 520, 521, 522, and 570 as given, and did not request a pinpoint instruction indicating that the jury could reduce a first degree murder finding to a second degree murder finding if it found defendant had acted under provocation, even if defendant's reaction to the provocation was not objectively reasonable.

The jury was further instructed to "[p]ay careful attention to all of the[ ] instructions and consider them together." (CALCRIM No. 200.)

In their closing argument, when explaining the differences between first and second degree murder, the People focused on the findings the jury would need to convict defendant of first degree murder instead of second degree murder. In so doing, the People defined premeditation and deliberation and explained how the evidence suggested those two elements existed, and did not touch on the role of provocation in negating the existence of either.

In contrast, when arguing the crime was murder and not voluntary manslaughter, the People focused on the role of "[h]eat of passion, sudden quarrel, provocation." In so doing, the People indicated that the provocation that would reduce a murder finding to

15

manslaughter would need to "have caused a person of average disposition . . . to act rashly and without due deliberation, and from passion rather than judgment. ¶ The law further says that you consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts." The People also explained that if "enough time passed for a cool-off period, murder is not reduced."

To the extent defense counsel made arguments regarding possibly reducing a finding of guilt from first degree murder to second degree murder or voluntary manslaughter, he focused on the fact that there was evidence of "a sudden quarrel and argument" in the backyard, that there was evidence that Virgil was the sort of person that might engage in such a fight, and that "based on the fight in the backyard . . . and [on] all the surrounding circumstances [that] occurred and what testimony you heard . . . no one was carefully weighing anything back there which is required for premeditation and deliberate and there was rash and impulsive actions that occurred in generating this fight."

In their rebuttal, the People revisited the concept of "remoteness" and how it might impact the finding of provocation required to reduce a finding of guilt from murder to voluntary manslaughter.

A single instruction to a jury "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (*Cupp v. Naughten* (1973) 414 U.S. 141, 146-147 [38 L.Ed.2d 368]; see also *People v. Haskett* (1990) 52 Cal.3d 210, 235.) In performing this evaluation, "we presume that jurors understand and follow the [trial] court's instructions." (*People v. Gray* (2005) 37 Cal.4th 168, 231.) Furthermore, we assume the jury followed *all* of the court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 431.) Thus, "[w]hen an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a

16

reasonable likelihood the jury applied the challenged instruction in an impermissible manner."  (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

Defendant claims the trial court unconstitutionally permitted the jury to find him guilty of first degree murder even if an unreasonable heat of passion negated the elements of deliberation and premeditation.  He argues that once the court decided to instruct the jury regarding provocation using CALCRIM No. 522, it was obligated to "correctly" advise them regarding the role heat of passion could play in negating a finding of deliberation and premeditation.  Contrasting the instructions given here--specifically CALCRIM No. 521--with CALJIC No. 8.20, which defendant characterizes as "the basic murder instruction" used before "the advent of CALCRIM instructions," defendant argues the instructions given "fail to instruct the jury on the basic principle" that a subjective, unreasonable heat of passion can reduce a murder charge.

Additionally, defendant implies that by including CALCRIM No. 570, which describes the objective standard used in considering the role of heat of passion in reducing a finding of murder to one of voluntary manslaughter, the trial court left the jury to only understand provocation as something that needed to be reasonable to apply in any context.

Though defendant frames his argument as one regarding the correctness of the instructions given and does not argue that the trial court was obligated to sua sponte provide an additional instruction regarding the role of subjective heat of passion in negating the premeditation and deliberation necessary for a first degree murder finding, in consistently characterizing the error that made the instructions incorrect as a failure to instruct on a specific point of law, he is functionally arguing the court had a sua sponte duty to include a specific additional instruction regarding the role subjective heat of passion in a first degree murder finding.  We disagree with defendant and find *People v. Jones* (2014) 223 Cal.App.4th 995 (*Jones*) dispositive here.

"The trial court has a sua sponte duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. [Citation.] This sua sponte duty encompasses instructions on lesser included offenses that are supported by the evidence. [Citation.] Additionally, even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly. [Citation.] Once the trial court adequately instructs the jury on the law, it has no duty to give clarifying or amplifying instructions absent a request. [Citation.] [¶] In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant. [Citation.] We consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331-1332 (*Hernandez*).)

As defendant points out, the provocation necessary to reduce first degree murder to second degree murder is based on a subjective standard. "To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. [Citation.] If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1332.) In contrast, the provocation necessary to reduce any murder to voluntary manslaughter requires more. "For that, an objective test also applies: the provocation must be so great that, in the words of CALCRIM No. 570, it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.' " (*Jones*, *supra*, 223 Cal.App.4th at pp. 1000-1001.)

In *Jones*, *supra*, 223 Cal.App.4th 995, the jury was also instructed with CALCRIM Nos. 520, 521, 522, and 570. (*Jones*, *supra*, at p. 999.) The defendant "argue[d] that these pattern instructions were likely to have misled the jury into

18

concluding that the objective test applies both for reduction of first to second degree murder as well as from murder to manslaughter." (*Id.* at p. 1001.) The *Jones* court rejected this argument because these instructions "are *correct*. They accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed. CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' [Citation.] As the jury also was instructed, a reduction of murder to voluntary manslaughter requires more. It is here, and only here, that the jury is instructed that provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment." (*Ibid.*, italics added.)

We agree with the *Jones* court that the instructions correctly set forth the law. CALCRIM No. 521 informed the jury that to find first degree murder instead of second degree murder the defendant must have "carefully weighed" his decision "knowing the consequences" and not acted "rashly, impulsively, or without careful consideration." CALCRIM No. 522 then told the jury it could consider the role provocation may have played in determining if the murder was first or second degree. The jury was then informed with CALCRIM No. 570 that while heat of passion could also reduce murder to voluntary manslaughter, in that specific context, the defendant's reaction must have been that of an average person. Taken together, these instructions paint clear guidelines: in order for the crime to be first degree murder, the defendant must have been able to consider what he was doing, known the consequences, and acted anyway. If something was provoking him--either reasonably or unreasonably--the jury could consider if that provocation might have caused him to act rashly and impulsively, i.e., without careful consideration, thus without premeditation and deliberation. In contrast, in order to further reduce murder to voluntary manslaughter, whatever it was that provoked

19

defendant needed to be something that would provoke an average person. The jury was sufficiently and accurately instructed on provocation and the People's burden of proof. (See also *Hernandez*, *supra*, 183 Cal.App.4th at p. 1334 ["We are satisfied that, even without express instruction, the jurors understood that the existence of provocation can support the absence of premeditation and deliberation"].)

To the extent defendant is actually asserting the trial court should have further instructed on the type of provocation sufficient to preclude premeditation and deliberation, it appears settled that he is arguing for a pinpoint instruction that does not need to be given sua sponte. (See *People v. Hardy* (2018) 5 Cal.5th 56, 99 ["Instructions on provocation are pinpoint instructions that need not be given sua sponte but only on request"]; *People v. Rogers* (2006) 39 Cal.4th 826, 878-879 ["Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' "] [(*Rogers*)]; *Jones*, *supra*, 223 Cal.App.4th at p. 1001 [instruction that objective test does not apply to reduction of degree of murder is a pinpoint instruction]; *Hernandez*, *supra*, 183 CalApp.4th at p. 1333 ["instruction on provocation for second degree murder is a pinpoint instruction"].) This, "takes us to the second reason to reject [defendant's] argument. What [defendant] is arguing is that a more specific instruction, actually a pinpoint instruction, should have been given informing the jury that the objective test did not apply to reduction of the degree of murder. (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1333.) Defense counsel did not request such an instruction, and his failure to do so forfeits the claim on appeal. [Citations.]" (*Jones*, *supra*, 223 Cal.App.4th at p. 1001.)

Defendant tries to escape the import of *Jones* by arguing, first, that *Jones* is wrong, and, second, by trying to distinguish the facts here from the facts at issue in *Jones*. Neither argument is persuasive.

20

As to the first argument, defendant reasons that *Jones* relied on *Hernandez*, which in turn relied on *Rogers, supra*, 39 Cal.4th 826, and *Rogers* involved a different set of jury instructions. In *Rogers*, the trial court did not give CALJIC No. 8.73, (see *Rogers*, at pp. 877-878) which provides that, "[i]f the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation." The trial court had, however, given CALJIC No. 8.20, which includes an instruction that, "[i]f you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree."

Defendant argues that the analysis in *Rogers* was different from the analysis that ought to have been done in *Jones*, because the court in *Rogers* specifically instructed the jury that "a sudden heat of passion or other condition precluding the idea of deliberation" could reduce first degree murder to second degree murder, while in *Jones* as here the courts did not give that instruction. But this is a distinction without a difference. Similar to the language defendant focuses on in CALJIC No. 8.20, CALCRIM No. 522 informed the jury that "[p]rovocation may reduce a murder from first degree to second degree." Neither of these instructions specifically conveys that the test to be applied is a subjective or objective one, yet both indicate the jury can consider if a heightened mental or emotional reaction negated a finding that essential elements that distinguish first degree murder from second degree murder--i.e., willfulness, deliberation, and premeditation-- were present. Additionally, as previously discussed, here CALCRIM No. 570 specifically instructed the jury that to reduce a finding of murder to voluntary manslaughter they would need to make the additional finding that a mitigating

21

provocation was reasonable; and no similar qualifications were provided to reduce first degree murder to second degree murder. The implication is that an extra finding of reasonableness is not required to reduce a finding of first degree murder to second degree murder.

As to his second effort to minimize the import of *Jones* here, defendant observes that in *Jones*, the court indicated that, "the result might have been different if the prosecutor had argued that an objective test applied to reduce murder from first to second degree." (*Jones*, *supra*, 223 Cal.App.4th at p. 1001.) Then, defendant points to arguments made by the People in explaining how provocation could reduce a murder charge to a voluntary manslaughter charge, and suggests this recitation, taken together with the jury instructions could have led the jury to believe only a reasonable provocation could reduce a first degree murder finding to a second degree murder finding.

Much like his suggestion that CALCRIM No. 570, which focused on how reasonable provocation could reduce murder to manslaughter, could mislead a jury into believing it would need to apply an objective test in considering how provocation may have eliminated deliberation and premeditation, this argument ignores the import of the context of the People's statements. They did not argue that an objective test applied to reduce murder from first to second degree, instead the People limited their discussion about the application of objective standards to their manslaughter analysis.

The reasoning in *Jones* was correct and applies here. The trial court's instructions were correct and did not mislead the jury, and defendant has forfeited any claim that the court should have made a sua sponte instruction specifying a subjective test could be applied to reduce first degree murder to second degree murder.

22

# IV

## *The Trial Court Did Not Err in Excluding the Expert*

Defendant argues that the trial court violated his constitutional right to present a defense when it excluded testimony from an expert witness who indicated in a report that methamphetamine in Virgil's system might have caused him to act aggressively. We disagree.

Femoral blood analysis revealed Virgil's blood had a blood-alcohol content of 0.03 percent and a methamphetamine level of 39 nanograms per milliliter. As part of their motions in limine, the People sought to exclude this evidence without a showing of relevance, pursuant to Evidence Code section 352.

The defense had asked Dr. Curtis Rollins, a forensic pathologist, to evaluate the results and render an opinion as to how the reported blood-alcohol level and methamphetamine content might impact a person's behavior. In a report, Dr. Rollins wrote, "I have been requested to address the presence of alcohol and Methamphetamine in the decedent's body at the time of death and how this would have influenced his cause of death and in general manifestations of these drugs in humans. Of note, as a Forensic Pathologist the behavioral aspects are beyond my area of expertise; however I completed 3 years 8 months of post graduate training in the Department of Psychiatry and Behavioral Medicine, Wake Forest University . . . . My current clinical practice is in Addiction Medicine and Psychiatry in Santa Clara California." Dr. Rollins observed the levels of chemicals found in the blood analysis, "brings up the question of tolerance, individual tolerance to the drug effects." In terms of possible drug impacts, Dr. Rollins stated, "[l]evels in this range can be expected to cause restlessness, confusion, anxiety, aggression, hallucinations, cardiac arrythmia's [*sic*], hypertension (severe), hypothermia, circulatory collapse, convulsions and death."

At the hearing on motions in limine, defense counsel indicated he believed that Dr. Rollins's opinion might be relevant if the issue of self-defense was raised during the case and on the issue of whether the evidence supports a voluntary manslaughter finding. Defense counsel thought it might be relevant to a "passion argument." The People observed that they were not aware of any evidence that addressed the witnesses' behavior right before the fight started and, as such, they were unaware of how the impact of alcohol or methamphetamine found in Virgil's blood might be relevant. The trial court shared the People's hesitance regarding Dr. Rollin's proposed testimony, but it indicated it would consider the issue again at a later time if "some evidence [came] in that at least raises a question of whether or not it is relevan[t]." Accordingly, the trial court also granted the People's motion to exclude evidence about the levels of alcohol and methamphetamine found in Virgil's system, but stated, "if some evidence comes out during trial that provides a basis for revisiting that, we will come back to this."

The defense raised the issue of Dr. Rollins's testimony again during trial. Defense counsel indicated that Dr. Rollins, "would render opinions that the levels" of methamphetamine found "can be expected to cause restlessness, confusion, anxiety, aggression, hallucinations," and various medical problems. Defense counsel "was interested in calling [Dr. Rollins] relative to his opinion that he would render relative to behavioral aspects of somebody with this level of methamphetamine of aggression, and [counsel] felt it was relevant . . . to the lesser included offense [of] . . . voluntary manslaughter based on heat of passion. ¶ There's been a significant amount of evidence adduced that there was a quarrel, an argument, and that there was significant intense emotions in the backyard of the residence, and that subsequent thereto, the decedent was involved in some form of a fight with somebody. ¶ And subsequently [Virgil was] in the kitchen area, involved in a fight with the defendant, Rodney Bruno. ¶ So I felt that the . . . potential behavioral manifestations of aggression by the decedent . . . would be relevant for that purpose."

The People objected on a few grounds.  Most notably, the People argued that heat of passion arguments are relevant to the defendant's state of mind, not the victim's, and whether there was methamphetamine in Virgil's system when he died was not relevant to the facts at issue in the case.

The trial court agreed with the People.  It observed that there had been no "evidence before [the] jury that indicate[d] that the victim was doing anything particular. ¶ In fact, to the contrary.  The one specific comment by any witness with regard to Virgil [T.] was that he apparently was apologizing, which seems inconsistent with the proffered testimony."  The court acknowledged it had not seen Dr. Rollins's report, but observed it "at least [had] a question if, in fact, [Dr. Rollins was] qualifying his own statements in his reports with regard to not being a behavioral expert."  Yet, "even without getting there" the trial court did not see the relevance of the preferred testimony and, accordingly, did not allow it.

Evidence is only admissible at trial if it is relevant.  (Evid. Code, § 350.)  Relevant evidence is " evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  "The trial court is vested with wide discretion in deciding relevancy."  (*People v. Warner* (1969) 270 Cal.App.2d 900, 908.)  "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling on a relevance objection."  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123.)

Defendant argues that the excluded testimony was relevant to the defense's argument that the evidence suggests the crime committed was voluntary manslaughter based on a heat of passion.  He notes there was evidence of "screaming" and an argument in the backyard.  He reasons that evidence that methamphetamine can cause aggressive behavior could have shown Virgil had been the one to act aggressively and become involved in the fight.  He argues that excluding the evidence of Virgil's

25

methamphetamine use and the potential impact it had on him violated his constitutional right to present a defense, and was prejudicial and not harmless.

Defendant's arguments are misplaced. "[E]vidence which produces only speculative inferences is irrelevant evidence." (*People v. De La Plane* (1979) 88 Cal.App.3d 223, 242.) Additionally, the exclusion of evidence that has no relevance, does not implicate due process concerns. (*People v. Babbitt* (1988) 45 Cal.3d 660, 685.) Considering the other evidence presented in this case and Dr. Rollins's own qualifications of his opinion in his report, the most he could have offered defendant was testimony that could lead the jury to speculate that maybe Virgil had acted aggressively and in a manner that provoked defendant, even though there was an absence of other evidence that Virgil acted aggressively the day of the murder.

It is true that evidence was presented indicating there was a scuffle and yelling in the backyard in the minutes leading up the murder, and defense counsel pointed to this evidence in his closing argument. However, none of the witnesses suggested that Virgil was the aggressor or behaved in a particularly aggressive manner. To the contrary, the evidence is (1) defendant was the one to approach Virgil; (2) to the extent anyone heard the substance of any of the discussion between the parties in the backyard, defendant yelled about someone else killing his cat, defendant yelled and was angry about someone mistreating women, and the person who had supposedly killed the cat and mistreated women apologized; and (3) Lucinda did not hear anyone but defendant yelling. As such, the most Dr. Rollins's testimony could have done to advance defendant's position would have been to cause the jury to speculate that *maybe* Virgil had acted aggressively the day he was killed, because methamphetamine use *sometimes* causes people--who *may or may not* have had Virgil's tolerance level to methamphetamine--to act aggressively. The trial court did not abuse its discretion in excluding Dr. Rollin's testimony, nor did it violate defendant's right to present a defense.

26

*Defense Counsel Was Not Ineffective*

Defendant argues his trial counsel was prejudicially ineffective for failing to object to analogies used by the People during closing to explain the concepts of premeditation and deliberation.  We disagree.

The People included the following recitation regarding the meaning of deliberation and premeditation in their closing argument:  "Deliberate, that you weighed the considerations and you make a choice.

"Premeditation, considered beforehand.

"If you read the law . . . there are a lot of extra words.  They're important.  But when you read it, sometimes it seems a bit confusing.  But this is all it is.

"Think about yourself driving, and you're at an intersection, and you have to make an unprotected left-hand turn.  Now, you're at that intersection and you're weighing the consequences.  You see--you turn to your left and you see a car about a block away, but the car is driving kind of fast.

"You turn to your right and you see a bicyclist heading your way, and then you see a little kid who's at the crosswalk.  Hasn't stepped onto the street, but he's right there.

"And you have to consider the consequences; right?  You have to think about, if I make this turn, will that car on the left . . . hit me?  Will I make it before the cyclist?  Is this kid going to cross?

"And all of that can happen like that.  We all drive every day, and we have to make these decisions.  It can happen in a hot second.

"When we heard premed[itation] and deliberation, when we see it on TV, we think about this:  The night before, a group of people, they're coming together and making these extravagant plans to take a life.  That's not it at all.  It's just willful, premeditated,

deliberate.  And all it means is what I put up here.  You have an intent, you're making a choice, and you thought about it beforehand.

"So it's just like at that intersection.  You have to think about all the consequences, and you make that decision.  And so with intent, you make that turn.

"Some people who play baseball, you're at bat, you're holding the bat, you're looking at the pitcher.  If I swing, is that pitcher going to throw outside, high, low, what?  If I swing, I may strike out.  I may lose the game for my team.  But you weigh all of those consequences and you make a choice.

"And, again, it can happen in a split second.  Premed[itation] and deliberation is not that long, drawn out thing that we often see on TV.

"The law, in fact, says premed[itation] and deliberation is not measured in units of time.  Time for reflection will vary.  It depends.  The true test is not the duration of time, but extent of reflection.  A cold, calculated judgment can be formed in a short period of time.  The law recognizes that."

Trial counsel did not object.  Additionally, during his closing, defense counsel focused his argument on his position that a reasonable interpretation of the evidence was that someone other than defendant inflicted the wounds that killed Virgil.  When defense counsel did turn to argue the case for finding defendant guilty of lesser included offenses, he began by stating, "I want to briefly go over--the prosecution went over the distinction between murder and voluntary manslaughter.  I'm a little reluctant to do that because I [argue that defendant] was not the person that did it, that stabbed Virgil [T.]"

"To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different."  (*People v. Kelly* (1992) 1 Cal.4th 495, 519–520.)  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "  (*People v. Bolin, supra,* 18 Cal.4th at p. 333.)

28

We presume counsel's conduct fell within the "wide range of reasonable professional assistance." (*Maury, supra,* 30 Cal.4th at p. 389.) Our review is limited to the record on appeal and we must reject a claim of ineffective assistance "if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation." (*People v. Burgener* (2003) 29 Cal.4th 833, 880.) If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674].) " 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.)

If we consider the question of whether counsel's actions caused prejudice to the defendant, that "prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland v. Washington, supra,* 466 U.S. at p. 694.)" (*Maury, supra,* 30 Cal.4th at p. 389.)

Defense counsel was not asked why he did not object to the analogies the People used during their closing arguments. Thus, we ask if "there simply could be no satisfactory explanation" for his failure to object. (*People v. Burgener, supra,* 29 Cal.4th at p. 880.) Quite the contrary, the record provides an indication that there was a satisfactory explanation: defense counsel wanted the jury to believe defendant did not kill Virgil and, therefore, that the concepts of deliberation and premeditation were unimportant.

Defense counsel's primary argument in his closing was that defendant did not inflict the wounds that killed Virgil. Before discussing the standards and evidence related

29

to making a finding as to whether the killing was first degree murder, second degree murder, or voluntary manslaughter, defense counsel indicated he was "reluctant" to even go down that road. He wanted the jury to be left with the impression that the details involved in the definitions that distinguished the three crimes only warranted "brief[]" attention. Based on this, it is likely that if the People's analogies regarding deliberation and premeditation were misleading, defense counsel would have nevertheless opted not to object to those definitions, possibly leading to a brief discussion about the meaning of those terms and the utility and import of defining them precisely. The defense wanted the jury to believe that the nuances separating the three crimes never needed to come into play because defendant was not the killer, and, as such, quibbling over and dissecting those nuances was not worth the time.

Defense counsel was not ineffective for failing to object to the analogies used by the People because the objections would have been futile. Contrary to defendant's position, the People's use of the analogies was not improper, and defense counsel will not be found ineffective for failing to make a futile objection. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["[T]here is no merit to defendant's alternative contention that his trial counsel was ineffective for failing to object under Evidence Code section 352. Counsel is not required to proffer futile objections"].)

"A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) In so doing, a prosecutor "may draw from matters that are not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 289, internal quotations marks omitted.) " 'When attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments

in an improper or erroneous manner." ' (*People v. Centeno* (2014) 60 Cal.4th 659, 667 [338 P.3d 938] [].)" (*People v. Dalton* (2019) 7 Cal.5th 166, 251-252.)

When considering whether a murder was one in the first or second degree, that "the deliberation which must precede the killing in order to make the murder one of the first degree need not have existed for any given length of time is thoroughly settled." (*People v. Machuca* (1910) 158 Cal. 62, 64.) Here, both the intersection analogy and the baseball analogy fairly communicated to the jury that to reach a finding of deliberation and premeditation, the jury's focus should be on the degree of consideration and questioning involved, rather than the amount of time that elapsed when defendant first decided to act and then did act.

In their respondent's brief, the People aptly compared the use of the analogies by trial counsel to the analogies used by the prosecutor in *People v. Avila* (2009) 46 Cal.4th 680 (*Avila*). In *Avila*, the defendant raised multiple arguments that the prosecutor had committed misconduct. (*Id.* at p. 710, et seq.) The defendant argued that one instance of misconduct occurred when the prosecutor argued "that 'the "cold, calculated" judgment of murder is the equivalent of deciding whether to stop at a yellow light or proceed through the intersection.' " (*Id.* at p. 715.) Our Supreme Court corrected the defendant's characterization and indicated the prosecutor had instead, "used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of 'quick judgment' that is nonetheless 'cold' and 'calculated.' He then immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " (*Ibid.*) The Court found the defendant's claims of prosecutorial misconduct lacked merit. (*Id.* at pp. 710-711.)

Like in *Avila*, the driving and baseball examples used here, which included the People describing the thought process that would be involved in deciding which action to take, were used by the People at trial to provide a fair understanding of how an individual could weigh consequences and consider the circumstances quickly in making a decision to act. That is, the examples were used to illuminate how premeditation and deliberation might happen quickly, but that they do not happen without at least some degree of weighing the consequences

VI

*No Cumulative Error*

Because we find no error in the prior sections, there could not have been cumulative error.

VII

*Supplemental Issue*

In supplemental briefing, defendant argues that we should remand this case so that the trial court can consider striking the two five-year enhancements imposed due the court's finding that he committed prior serious felonies within the meaning of section 667, subdivision (a), because section 667 was amended to give trial courts discretion to strike prior-serious-felony findings after the judgment was entered in this case.

The People agree that the amended statutes apply retroactively in this case but contend that remand is not necessary because the record clearly indicates that the trial court would not exercise its discretion to strike the enhancements if given the opportunity. We agree with the People.

At the sentencing hearing, defendant asked the court to strike one of his prior convictions pursuant to section 1385. The conviction at issue was a 1980 conviction for voluntary manslaughter, when defendant was 16 years old. In opposing the request, the

People indicated that "if it was an aberrant one-time behavior, I believe [a] remoteness argument would apply. However, the court has the probation report in addition to his rap sheet. It's a continuing conduct. A very, very violent behavior. Given the nature of this crime, in addition to his past crimes, an exercise of 1385 would not be appropriate." The court denied the request, indicating that it "agree[d] with the People that when one looks at Mr. Bruno's record, he has a record that is fairly extensive. That record dates back . . . to 1980, [and] it also includes convictions in the 1990s and 2000s."

Section 667, subdivision (a)(1), adds a five-year sentencing enhancement to a sentence for a serious felony when the defendant, "previously has been convicted of a serious felony in this state." Section 1385, subdivision (a), permits a court to "either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." Section 1385, subdivision (b), gives courts the option to, "strike the additional punishment for [an] enhancement in the furtherance of justice" when it otherwise "has the authority pursuant to subdivision (a) to strike or dismiss an enhancement."

Prior to 2019, section 1385 stated trial courts had no authority "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (See § 1385, subd. (b) (2018).) "Senate Bill 1393," which was enacted after judgment was entered below, "removed this prohibition. (Stats. 2018, ch. 1013, §§ 1, 2.) The legislation became effective January 1, 2019. (Cal. Const., art. IV, § 8, subd. (c).)" (*People v. Jones* (2019) 32 Cal.App.5th 267, 272 (*Jones II*).)

As articulated by our Supreme Court in *In re Estrada* (1965) 63 Cal.2d 740, 742, when a statute is amended that mitigates a punishment after the prohibited act is committed but before final judgment, the "punishment provided by the amendatory act should be imposed." In *People v. Francis* (1969) 71 Cal.2d 66, 76, our Supreme Court applied *Estrada* to circumstances in which "the amendment does not revoke one penalty and provide for a lesser one but rather vests in the trial court discretion to impose either

33

the same penalty as under the former law or a lesser penalty." In *Francis*, our Supreme Court also clarified that an amended penalty statute applies in instances in which the amendment occurred after sentencing in the trial court but before the case was resolved on appeal. (*Id.* at p. 77.)

When the Legislature "enacted Senate Bill 1393," amending section 1385, "the Legislature did not indicate it intended the legislation to apply prospectively only. (*Estrada*, [*supra*, 63 Cal.2d] at p. 742; [*People v.*] Garcia [(2018) 28 Cal.App.5th 961,] 972.) The act thus applies retroactively to this case." (*Jones II*, *supra*, 32 Cal.App.5th at p. 272.)

A finding that amended sentencing provisions apply retroactively, "is not the end of the matter. We are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [].)" (*Jones II*, *supra*, 32 Cal.App.5th at pp. 272-273.) In considering the trial court record, "[t]he trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Id.* at p. 273.)

Here, the trial court's statements when considering the request to strike the prior serious felony make it clear it would not have stricken the section 667, subdivision (a)(1), enhancement had it been given the opportunity. The trial court observed the 1980 crime was part of an ongoing pattern of criminal behavior and that the crime, rather than being a remote and isolated action, was part of a chain of criminal behavior that continued through the next two decades. Based on this record, remanding this matter to allow the trial court to exercise its discretion under the amended versions of sections 667 and 1385 would be a waste of judicial and other resources.

## DISPOSITION

We affirm the trial court's judgment.

                         _____

                         HULL, J.

We concur:

_____

RAYE, P. J.

_____

HOCH, J.